RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee*,

    *v.*

PHILLIP ZABAWA,

     *Defendant-Appellant.*

No. 11-1519

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:04-cr-80844-1—Gerald E. Rosen, Chief District Judge.

Argued: October 5, 2012

Decided and Filed: June 3, 2013

Before: COLE and KETHLEDGE, Circuit Judges; and THAPAR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** John R. Minock, CRAMER & MINOCK, PLC, Ann Arbor, Michigan, for Appellant. Kathleen Moro Nesi, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** John R. Minock, CRAMER & MINOCK, PLC, Ann Arbor, Michigan, for Appellant. Kathleen Moro Nesi, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

  KETHLEDGE, Circuit Judge. "Inflict" is a narrower term than "cause." Here, while in federal custody, Phillip Zabawa assaulted a federal law enforcement officer. The officer responded by headbutting Zabawa, which left the officer with a cut over his

_____

  [*]The Honorable Amul Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

eye. A federal grand jury later indicted Zabawa for assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b). Zabawa was convicted of both offenses. But § 111(b) specifies that the defendant must "inflict[]" the predicate injury to the officer, rather than just proximately cause it; and here, the officer himself admitted that his injury might have resulted from his application of force (*i.e.*, the headbutt) to Zabawa, rather than from any force Zabawa applied to him. The district court found this distinction irrelevant, construing "inflict" to mean "cause." We respectfully disagree, and reverse Zabawa's conviction under § 111(b).

I.

On December 2, 2003, Zabawa was transferred from the Wayne County Jail to the Theodore Levin U.S. Courthouse for a sentencing hearing. When Zabawa arrived at the courthouse lockup, Detention Enforcement Officer Gregory Shelton sent him to a cell, telling him to close the door behind him. Zabawa refused, saying "he'd been locked up for 15 years and the last thing he was going to do was close his own cell door." Zabawa was agitated, so Shelton sent him to a nearby interview room to separate him from the other prisoners.

Detention Enforcement Officer David Murphy entered the interview room. When Murphy asked what was wrong, Zabawa exploded. He told Murphy that he was tired of being moved around and that, if he "ever got a gun, he'd be sure to use it." Murphy replied, "you're not going to get one here." Zabawa responded, "don't bet on it."

At that point, Murphy decided to handcuff Zabawa to prevent him from disarming an officer. Before he could do so, however, Zabawa lunged at Murphy and started punching him. Murphy blocked the attack, and then got Zabawa onto the floor by elbowing, kneeing, and headbutting him. After a brief struggle, Murphy handcuffed Zabawa with the help of other officers.

During the fight, Murphy suffered a cut over his eye that required six stitches. Murphy later testified that he did not know whether the cut happened when he headbutted Zabawa or when Zabawa punched him.

On October 13, 2004, a grand jury indicted Zabawa for assaulting and inflicting bodily injury on a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b). The indictment alleged only one injury: the cut above Murphy's eye. Zabawa pled not guilty. He then returned to state custody.

Although the district court set a trial date of February 8, 2005, Zabawa's trial did not take place for more than five and a half years. Between January 2005 and May 2006, Zabawa and the government agreed 10 times to postpone the trial. Then, on May 30, 2006, Zabawa's attorney moved to evaluate Zabawa's competency. The district court granted the motion, but did not enter a written order for a competency evaluation until February 2007.

Twenty-two months later, on December 2, 2008, the district court ordered Zabawa transported to a federal facility for the evaluation. But that order was not carried out, so the court issued a second transportation order on March 20, 2009. After the second order, it took 26 days to transport Zabawa to the evaluation, another 37 days to evaluate him, and 18 days more to return him to state custody. In July 2009, the psychologist who evaluated Zabawa sent the district court a report concluding that Zabawa was competent to stand trial. The court found Zabawa competent a month later.

Finally, in October 2009, Zabawa moved to dismiss the indictment on grounds that the delay in his federal prosecution had violated his statutory and constitutional rights to a speedy trial. The pendency of that motion pushed the trial back another 10 months. The district court denied the motion.

The court held a bench trial between August 30 and September 1, 2010, after which it found Zabawa guilty of inflicting bodily injury on Officer Murphy in violation of § 111(a)(1) and (b). The court sentenced Zabawa to 222 months' imprisonment. This appeal followed.

II.

A.

Zabawa challenges the sufficiency of the evidence supporting his conviction for "inflict[ing] bodily injury" on Officer Murphy in violation of 18 U.S.C. § 111(a)(1) and (b). But the relevant facts are undisputed: the cut over Murphy's eye might have resulted from Murphy's own headbutt, rather than from a punch by Zabawa. What the parties dispute, instead, is what "inflict" means. At the time of the fight between Zabawa and Murphy, § 111(a)(1) provided:

> Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [officer or employee of the United States] while engaged in or on account of the performance of official duties . . . shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than 8 years, or both.

Section 111(b) further provided: "*Whoever*, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon . . . or *inflicts bodily injury*, shall be fined under this title or imprisoned not more than 20 years, or both." (Emphasis added.) Thus, § 111 created three crimes: simple assault, punishable by up to one year's imprisonment; all other assaults, punishable by up to eight years' imprisonment; and assault in which the defendant uses a deadly or dangerous weapon or inflicts bodily injury, punishable by up to 20 years' imprisonment.

The question here is whether Zabawa "inflicted" the cut to Murphy's eyebrow even if the cut resulted from the actions (*i.e.*, the headbutt) of Murphy himself. The government argues the answer is yes: in its view, "inflict[]" as used in § 111(b) is synonymous with proximate cause, and Zabawa proximately caused all the injuries in the fight—because he started it. In response, Zabawa argues that inflict refers only to a particular type of cause, namely, to cause harm (usually a physical injury) by "strik[ing] against"; and moreover that, since the statute uses the active voice, the defendant must be the one who does the striking. The district court adopted the

government's interpretation. We review the court's interpretation de novo. *United States v. Gagnon*, 553 F.3d 1021, 1025 (6th Cir. 2009).

"Inflict" as used in § 111(b) is not defined by the statute itself. When a statute contains an undefined term, we give the term its ordinary meaning. *United States v. Lumbard*, 706 F.3d 716, 723 (6th Cir. 2013). In determining that meaning, dictionaries are a good place to start. One dictionary defines "inflict" to mean "to cause (something unpleasant) to be endured" or, alternatively, "to give by or as if by striking." Merriam-Webster's Collegiate Dictionary 599 (10th ed. 1994). The former definition incorporates the word "cause" and thus arguably supports the government's interpretation here; the latter definition is precisely the one that Zabawa advocates. Two other dictionaries offer nearly the same two definitions. *See* Random House Unabridged Dictionary 979 (2d ed. 1993); Webster's Third New International Dictionary of the English Language Unabridged 1160 (1993). Thus, in the abstract, the dictionaries lend some support to each party's interpretation.

Our task in construing a statute, however, is to find not merely a reasonable interpretation, but the best one. (Agency cases are an exception.) And on balance the ordinary usage of "inflict" favors Zabawa's interpretation. "Inflict" is a more specialized term than "cause." Inflict normally refers to direct *physical* causation of physical harm: "*inflicted heavy losses on the enemy; a storm that inflicted widespread damage.*" American Heritage Dictionary 926 (3d ed. 1992). (When one departs from this sense of inflict—"the speaker inflicted a long and boring speech upon the audience"—the irony is usually intended.) This meaning holds almost anywhere one looks: the thermal and barometric conditions giving rise to a storm, for example, do not inflict widespread damage; the storm does. Othello dies from a wound that he inflicts upon himself, even though Iago proximately caused him to do it. Field Marshal Montgomery blundered by ordering his paratroopers to take "a bridge too far" at Arnem, but he did not inflict the heavy losses that followed; the Germans did. And neither did General Eisenhower inflict the injuries that his men suffered on D-Day.

So-called synonymous words often have significant variations of meaning. "Venerable" is more respected than "old"; "puerile" is more cutting than "childish"; "equanimity," more admirable than "calm." In each instance the specialized term conveys a nuance that the more general term does not. The same is true here. Inflict means something more precise—and thus something narrower—than merely "[t]o be the cause of or reason for; result in." American Heritage Dictionary 305 (definition of "cause"). What inflict conveys is a sense of physical immediacy: to cause harm directly, by physical force.

That § 111(b) uses "inflict" in this sense is entirely consistent with the provision's context: "[w]hoever . . . inflicts *bodily injury*[.]" 18 U.S.C. § 111(b) (emphasis added). Thus, as used in § 111(b), "inflict" refers to physical, not proximate, causation. The person whose action was the direct physical cause of Murphy's laceration, therefore, is the person who inflicted it for purposes of § 111(b). And even the government admits that Murphy himself might have been that person.

To all this the government offers a policy-based response. Citing an 1868 case for the proposition that we should read § 111(b) in a manner that "promotes the policy and objectives of the legislature[,]" the government asserts that our reading of "inflict" would frustrate the statute's purpose "to protect federal officers from a wide range of harmful conduct." But disembodied notions of statutory purpose cannot override what the statute actually says. And here the statute says inflict, not cause. Moreover, our reading does not frustrate what the government identifies as the statute's purpose. Eight years is a substantial term of imprisonment—which in this case would amount to more than a year per stitch. The 20-year term remains available in cases where the defendant's own actions directly cause injury. And otherwise it is hardly absurd to conclude that, in choosing the word "inflict" rather than "cause," Congress meant to tighten the causal chain between action and injury before sending a man to prison for 20 years.

Two other circuits have addressed the meaning of inflict as used in § 111(b); one decision is consistent with our interpretation, the other probably not. The inconsistent

decision is *United States v. Garcia-Camacho*, 122 F.3d 1265 (9th Cir. 1997), in which the Ninth Circuit conflated "cause" and "inflict" in a single conclusory paragraph. *Id.* at 1269. On its facts, however, the result there is likely consistent with our interpretation of the statute here, because there the officer's injury arguably resulted directly from the defendant's application of physical force to the officer's body. *Id.* at 1267.

The consistent decision is *United States v. Jackson*, 310 F.3d 554 (7th Cir. 2002) (Easterbrook, J.). There, Ray Jackson fled when several deputy marshals tried to arrest him. The marshals eventually cornered and tackled Jackson. He then started twisting as hard as he could to roll away from the marshals. One of those twists apparently tore a ligament in Deputy Marshal Randy Scott's thumb as he tried to handcuff Jackson.

The issue before the Seventh Circuit was whether the evidence was sufficient to support Jackson's conviction under § 111(b). Interpreting the same language that we interpret here, the Seventh Circuit first concluded—and we agree—that "inflict" does not require any intent to cause to harm. *Id.* at 557. At that point, however, the court did not simply proceed to analyze whether Jackson had proximately caused Scott's injury. (Obviously he did.) Instead, the court adopted the same core premise that we adopt here: "[d]oubtless 'inflict' is more restrictive than 'cause[.]'" *Id.* The court then rejected Jackson's challenge on the facts, reasoning that the torn ligament "occurred while Scott was grappling with Jackson, *who applied force directly to Scott's person*." *Id.* (emphasis added). To cause injury in that manner, the court said, "satisfies the normal understanding of 'inflict.'" *Id.*

Here, the proofs do not satisfy the normal understanding of "inflict." We conclude from the record that the government did prove beyond a reasonable doubt that Zabawa was guilty of non-simple (*i.e.*, felony) assault in violation of § 111(a)(1). But the government did not prove that Zabawa inflicted Murphy's laceration for purposes of § 111(b).

B.

Zabawa also challenges his convictions under both § 111(a)(1) and (b) (the latter challenge is moot, given our holding above) on grounds that the government violated his statutory and constitutional rights to a speedy trial.

1.

Zabawa argues that he was tried in violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* The Act requires that a defendant's trial begin within 70 days of the information or indictment, or his first appearance in court, whichever occurs later. 18 U.S.C. § 3161(c)(1). But the Act excludes certain kinds of delay from the 70-day limit. *See id.* § 3161(h). We review the district court's application of the Act de novo. *United States v. Gardner*, 488 F.3d 700, 717 (6th Cir. 2007).

Here, the parties agree that at least 55 "countable days" elapsed between Zabawa's first court appearance and his trial. The parties also agree that the Act excludes the delay that resulted from the trial continuances, *see* 18 U.S.C. § 3161(h)(7)(A), Zabawa's speedy-trial motion, *see id.* § 3161(h)(1)(D), and 30 days of his competency evaluation, *see id.* § 3161(h)(1)(A). But the parties disagree as to whether four other blocks of time should count against the speedy-trial clock. We address each in turn.

First, Zabawa argues that 108 countable days elapsed between December 2, 2008 (when the district court first ordered that the government transport him to his competency evaluation) and March 20, 2009 (the second time the court issued a transportation order). Section 3161(h)(1)(F) generally excludes from the speedy-trial clock any "delay resulting from transportation of any defendant . . . to and from places of examination." That section also provides, however, that "any time consumed in excess of ten days from the date [of] . . . an order directing such transportation and the defendant's arrival at the destination shall be presumed to be unreasonable[.]" (Punctuation omitted.) If the government does not rebut the presumption of unreasonableness, that time counts against the speedy-trial clock. *See United States v.*

*Tinklenberg*, 579 F.3d 589, 596 (6th Cir. 2009), *rev'd in part on other grounds by* 131 S. Ct. 2007 (2011).

Here, the government rebutted the presumption. After the district court issued the first transportation order, the marshals repeatedly attempted to transport Zabawa from state custody to federal custody. But the Michigan Department of Corrections repeatedly refused (each time for good reasons) to release him. On the first occasion, Zabawa had broken his hand in a fight earlier that year and had several follow-up medical appointments to complete. The State thereafter delayed Zabawa's release when he went on a one-month hunger strike. The State delayed his release again after placing him in protective custody because of Zabawa's own disciplinary violations. These delays were Zabawa's fault, not the government's, and thus do not count against the clock. *See United States v. Turner*, 602 F.3d 778, 785 (6th Cir. 2010).

Second, Zabawa argues that part of his competency evaluation should count against the 70-day limit. Here he relies on 18 U.S.C. § 4247(b), which generally limits a defendant's psychiatric evaluation to 30 days. Zabawa's evaluation lasted 37 days, so he says we should add 7 days to the speedy-trial clock. But this argument is foreclosed by precedent: "§ 4247(b) does not limit the time period for a competency evaluation with respect to calculations under the Speedy Trial Act." *Tinklenberg*, 579 F.3d at 595–96 (quotation marks omitted).

Third, Zabawa argues that 18 transportation days elapsed on his trip from the competency evaluation back to state custody. We disagree: a motion by Zabawa was pending during all 18 of those days, which means they are excluded under another provision of the Act. *See* § 3161(h)(1)(D).

Fourth, Zabawa argues that the speedy-trial clock resumed when the district court received his competency evaluation, rather than later, when the court found him competent. Zabawa says that should add another 36 days. This argument too is foreclosed by precedent: the clock stays stopped until the court makes a competency finding. *See Tinklenberg*, 579 F.3d at 597.

In sum, only 55 countable days elapsed between Zabawa's first court appearance and his trial.  The government therefore did not violate his rights under the Speedy Trial Act.

2.

Zabawa also argues that he was denied his Sixth Amendment right to a speedy trial.  We review the court's decision de novo.  *United States v. Young*, 657 F.3d 408, 413–14 (6th Cir. 2011).  Whether the government violated Zabawa's Sixth Amendment right depends on four factors:  the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

The first factor is a threshold requirement:  we only consider the remaining *Barker* factors if the delay is longer than one year.  *See United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006).  Here, the delay was six years, so we consider the remaining factors.

The second *Barker* factor looks at "whether the government or the criminal defendant is more to blame for [the] delay."  *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005) (alteration in original) (quotation marks omitted).  Here, Zabawa caused eight months of delay when his attorney (not his lawyer on appeal) promised but then failed to prepare a proposed order for his competency evaluation.  Zabawa caused another 11 months of delay when his attorney again promised but failed to arrange for a doctor to perform the evaluation.  Zabawa caused three more months of delay through his disruptive behavior in state prison—the government did not force him to break his hand in a fight or to start a one-month hunger strike.  Zabawa also caused a 16-month delay when he agreed to postpone his trial 10 times between January 2005 and May 2006, and another 10-month delay when he filed a motion to dismiss for speedy-trial violations.

A total of 70 months passed between Zabawa's indictment and his trial; Zabawa is to blame for at least 48 of them.  The second factor therefore weighs against him.  *See United States v. Brown*, 498 F.3d 523, 531 (6th Cir. 2007).

As to the third *Barker* factor, Zabawa did not assert his right to a speedy trial until October 20, 2009.  By that point, most of the delay had already occurred.  This failure to assert his right makes his claim dubious.  *See id.* at 531–32.

Finally, the fourth *Barker* factor "requires the defendant to show that substantial prejudice has resulted from the delay."  *Robinson*, 455 F.3d at 608 (quotation marks omitted).  Zabawa contends that the delay has affected his ability to interview potential witnesses.  Specifically, he says that he could only find two of the other six prisoners in lockup at the time of the attack, neither of whom would agree to talk to him.  But Zabawa has not explained what these prisoners could have said to help him, given that they were locked up down the hall during the assault.  Zabawa also contends that, because his attack on Murphy was so brief, any witness's memory would have faded significantly over time.  But mere "loss of memory is an insufficient reason to establish prejudice."  *United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003).

In the alternative, Zabawa argues that we should treat the delay here as presumptively prejudicial because it was extreme.  The presumption of prejudice only applies, however, when the delay is attributable to the government's negligence.  *See United States v. Ferreira*, 665 F.3d 701, 706 (6th Cir. 2011) (citing *Doggett v. United States*, 505 U.S. 647, 657 (1992)).  And here, most of the delay was Zabawa's fault.

The *Barker* factors weigh heavily against Zabawa.  Thus, the government did not violate his Sixth Amendment right to a speedy trial.

\*     \*     \*

We affirm Zabawa's conviction under § 111(a)(1), reverse his conviction under § 111(b), and remand the case for further proceedings consistent with this opinion.