RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0276p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MEHRDAD HOSSEINI,

　　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

KIRSTJEN M. NIELSEN, Secretary of the United States Department of Homeland Security; L. FRANCIS CISSNA, Director, United States Citizenship and Immigration Services, in his official capacity; KRISTINE R. CRANDALL, Director of Nebraska Service Center, United States Citizenship and Immigration Services, in her official capacity,

　　　　　　　　　　*Defendants-Appellees*.

No. 17-6453

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:14-cv-00404—Karen K. Caldwell, Chief District Judge.

Argued:  October 18, 2018

Decided and Filed:  December 19, 2018

Before:  KEITH, CLAY, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Lance Curtright, DE MOTT, MCCHESNEY, CURTRIGHT, ARMENDARIZ, LLP, San Antonio, Texas, for Appellant.  Joseph Francis Carilli, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Lance Curtright, DE MOTT, MCCHESNEY, CURTRIGHT, ARMENDARIZ, LLP, San Antonio, Texas, for Appellant.  J. Max Weintraub, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

——————————

**OPINION**

——————————

NALBANDIAN, Circuit Judge. Mehrdad Hosseini fled his native Iran and obtained asylum in the United States in 1999. Two years later, he applied to adjust his legal status to become a lawful permanent resident. But the United States Citizenship and Immigration Services ("USCIS") denied that application after concluding that Hosseini provided material support to two Iranian terrorist organizations, rendering him inadmissible to the United States under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd).

This case turns on whether Hosseini's copying and distribution of flyers amounts to material support of a terrorist organization. Over an approximate six-year span after the 1979 Iranian Revolution, Hosseini made copies of and distributed flyers from several Iranian non-governmental organizations, including the Mujahadin-e Khalq ("MeK") and the Fadain-e Khalq ("FeK").[1] Hosseini insists that the flyers he distributed alerted Iranians to the new regime's human rights abuses, including its crackdown on women, students, workers, and other civil dissidents. Nonetheless, USCIS determined that MeK and FeK were terrorist organizations and that Hosseini provided them material support by copying and distributing their flyers. After USCIS denied his application, Hosseini sought relief in federal court, arguing that USCIS's inadmissibility determination was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201. The district court affirmed USCIS's determination. We AFFIRM.

**I.**

In 1997, Mehrdad Hosseini's wife, Nasrin Abdolrahmani, left Iran with her two children and traveled to the United States on a B-2 tourist visa. Shortly thereafter, Abdolrahmani applied for asylum, noting her genuine fear of persecution were she to return to Iran. Abdolrahmani explained in her affidavit supporting her asylum petition that the government was targeting her

—————————————

[1]These organizations have different names and spellings. MeK is sometimes called "the Mojahedin," "the Mujahedeen," and "MEK." Likewise, "Fedaian," "Fadaian," and "Fadayan" are substitutes for FeK. We refer to the organizations as "MeK" and "FeK," unless quoting a source.

family because of her husband's prior ties to MeK, which sought to overthrow the radical Islamic clerics who led the Iranian regime following the 1979 Iranian Revolution. She stated that her husband described his involvement with MeK as "minimal, occasional, and [ ] mostly in the form of providing copying and telefax services to facilitate distribution of political leaflets and articles at the request of his brothers who were active in the organization." Nonetheless, Abdolrahmani stated that she threatened to leave Hosseini after the birth of their first child unless he severed his ties to the organization. Hosseini acceded to her demand sometime in the mid-1980s.

After an immigration judge granted her asylum petition, Abdolrahmani submitted a Form I-730 petition to obtain asylum for her husband as a derivative beneficiary spouse.[2] A USCIS adjudicator granted that petition too, despite the fact that he was unable to review Abdolrahmani's file and therefore lacked knowledge about Hosseini's ties to MeK.

About one year after obtaining asylum in the United States, Hosseini filed a Form I-485 application to adjust his legal status to that of a lawful permanent resident. The application asked Hosseini to describe his affiliation with any political organization—in the United States or elsewhere—since his 16th birthday. While Hosseini did not mention his connection to MeK, he stated that he "served to the Iranian Army as a soldier since May 1980 to May 1982" and that he "joint [*sic*: joined] to a political organization called Fadaeian Khalgh from 1979 to 1982 in Iran." In December 2007, USCIS contacted Hosseini to request additional information, noting that it had uncovered a discrepancy between his application and Abdolrahmani's 1997 affidavit. USCIS explained:

> A review of your Spouse's file reveals that you were a member of the Mujahedin prior to your marriage in 1984. In fact, your past membership within the Mujahedin was a prominent part of your spouse's asylum claim. You listed membership in Fadeian Khalqh in Part, 3, Section C of your Form I-485 application, but made no mention of the Mujahedin. Please provide an affidavit detailing the reason for this discrepancy or omission.

---

[2]Under 8 U.S.C. § 1158(b)(3)(A), the spouse or child of an alien who is granted asylum may also receive asylum.

Hosseini responded to USCIS's request through a March 2009 affidavit, explaining that he was aware of the contents of his wife's asylum application and that he "[has] nothing to hide and [has] never tried to hide anything." Hossieni stated that his wife's description of his involvement with MeK was accurate and that he believed USCIS would have considered his I-485 application in conjunction with his wife's asylum application.

In that same affidavit, Hosseini clarified the extent of his involvement with MeK and FeK. He explained that he was a young adult living in Iran in 1979 when radical clerics led by Ayatollah Khomeini toppled Iran's ruling monarch and imposed an Islamic theocracy. After the revolution, Hosseini became increasingly interested in politics and "eagerly sought out information about various political viewpoints." He read literature from different Iranian organizations, ranging from Islamic fundamentalists to women's rights groups. And he began to copy and distribute some of that literature, including literature from MeK and FeK. According to Hosseini, the literature that he distributed informed Iranians about the new government's human rights abuses, particularly its targeting of women, students, workers, and other civil dissidents. Moreover, the literature countered the regime's narrative that it enjoyed widespread public support. As Hosseini explained, the literature allowed Iranians to "find out what was really happening" in their country. Hosseini insisted that he never joined MeK, FeK, or any other Iranian political organization, explaining that his opposition to "a continued Islamic role in the federal government of Iran" would likely have precluded him from attaining membership in MeK. Although Hosseini conceded that he heard "rumors" that MeK engaged in terrorist attacks on the Iranian government, he "emphatically" denied ever learning "any reliable information that would indicate the MeK killed civilians" or American servicemen prior to the Iranian Revolution.

Six years passed with no response from USCIS. In March 2013, Hosseini filed a pro se complaint in federal district court to compel USCIS to decide his application. The district court issued an order on April 3, 2014, requiring USCIS to adjudicate Hosseini's application within 60 days. *Hosseini v. Napolitano*, 12 F. Supp. 3d 1027 (E.D. Ky. 2014). USCIS then issued a "Notice of Intent to Deny" Hosseini's application, explaining that Hosseini is inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for having engaged in terrorist activities by providing copying and

telefax services to MeK and FeK and distributing their literature. Hosseini filed a timely response to USCIS's Notice of Intent, explaining that he was not a member of MeK or FeK, had no knowledge of the organizations' terrorist activities, and did not provide material support to the organizations. USCIS nonetheless issued a final decision finding Hosseini inadmissible and denying his application.

Hosseini again turned to the courts for relief. This time, he challenged USCIS's denial of his application under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201. The district court dismissed the complaint for failure to state a claim. It concluded that USCIS's denial of Hosseini's application to adjust his legal status was not a final agency action under the Administrative Procedure Act and therefore was not reviewable. *Hosseini v. Beers*, No. 5:14-404, 2015 WL 5321803 (E.D. Ky. Sept. 11, 2015). This court reversed that decision and held that USCIS's denial of Hosseini's application constituted a final agency action. *Hosseini v. Johnson*, 826 F.3d 354 (6th Cir. 2016). After the matter returned to the district court, Hosseini filed a motion for summary judgment, arguing that USCIS's denial of his application was arbitrary and capricious and thus in violation of the Administrative Procedure Act. The district court denied Hosseini's motion and affirmed USCIS's denial of his application.

Hosseini appeals that decision.

**II.**

We first address our jurisdiction. The Immigration and Nationality Act expressly precludes judicial review of certain types of agency determinations, stating in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision or action is made in removal proceedings, no court shall have jurisdiction to review—(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or (ii) any [ ] decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this

subchapter[3] to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

8 U.S.C. § 1252(a)(2)(B). This provision would seem to prevent us from reviewing USCIS's denial of Hosseini's application to adjust his legal status because that decision is discretionary. But when Hosseini first appealed to this court, we explained that a court "may review 'non-discretionary decisions that underlie determinations that are ultimately discretionary.'" *Hosseini*, 826 F.3d at 358 (quoting *Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 711 (6th Cir. 2004)). And we said that admissibility determinations—even those underlying a discretionary decision—are "non-discretionary determinations that are subject to judicial review." *Id.* at 359. Accordingly, this court has jurisdiction to review USCIS's determination that Hosseini is inadmissible, but we cannot pass judgment on USCIS's final, discretionary decision to deny Hosseini's application.

## III.

We review de novo a district court's decision to uphold a final agency action on summary judgment. *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007). But we review the underlying agency action under the arbitrary and capricious standard. *Id.* Thus, we will hold unlawful any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review under that standard is narrow: "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nonetheless, we must ensure that the agency "articulate[d] a rational connection between the facts found and the choice made and . . . provide[d] something in the way of documentary support for its action." *GTE Midwest, Inc. v. Fed. Commc'ns Comm'n*, 233 F.3d 341, 345 (6th Cir. 2000) (internal quotations and citations omitted). And we must also ensure that the agency action is in accordance with the law, such that there is no "conflict with the language of the statute relied upon by the agency." *City of Cleveland*, 508 F.3d at 838.

---

[3] "[T]his subchapter" includes 8 U.S.C. § 1151–1381. As we noted in *Hosseini*, the provision at issue in this case, 8 U.S.C. § 1159, falls within the subchapter. *Hosseini*, 826 F.3d at 358 n.5.

**IV.**

On appeal, Hosseini raises four arguments regarding USCIS's inadmissibility determination, alleging that (1) USCIS's determination that MeK and FeK are terrorist organizations was arbitrary and capricious; (2) he presented clear and convincing evidence to USCIS that he had no knowledge of MeK and FeK's terrorist activities; (3) he did not provide material support by copying and distributing MeK and FeK's flyers; and (4) USCIS's denial of his application to change his legal status was arbitrary and capricious because it had previously granted him asylum and therefore determined that he was admissible. We consider each argument in turn.

**A.**

Hosseini argues that USCIS's determination that MeK and FeK are terrorist organizations was arbitrary and capricious. An alien may apply to adjust his legal status in the United States, provided that he is admissible. 8 U.S.C. § 1159(b)(5). But aliens who have provided material support to a terrorist organization are inadmissible and therefore cannot adjust their legal status. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc)-(dd). The Immigration and Nationality Act's ("INA") definition of terrorist organization includes three categories: (1) a Tier One organization, designated by the Secretary of State under 8 U.S.C. § 1189; (2) a Tier Two organization, designated upon publication in the Federal Register by the Secretary of State, after consultation with the Secretary of Homeland Security and the Attorney General; and (3) a Tier Three organization, composed of "two or more individuals, whether organized or not, which engages in or has a subgroup which engages in" terrorist activities. 8 U.S.C. § 1182(a)(3)(B)(vi)(I)-(III). USCIS determined that MeK and FeK were Tier Three terrorist organizations when Hosseini copied and distributed their flyers. We consider each designation below.

*MeK.* USCIS relied on the United States Department of State's Country Reports on Terrorism and the Library of Congress's Country Studies on Iran to assess MeK. Those sources describe MeK as a violent political organization that was responsible for the assassination of several U.S. military personnel and civilians in the 1970s. In fact, this court affirmed a Board of Immigration Appeals ("BIA") determination that MeK operated as a terrorist organization in the

1970s. *Daneshvar v. Ashcroft*, 355 F.3d 615, 627 (6th Cir. 2004). MeK's violent activities continued after the 1979 Iranian Revolution. USCIS notes that in September 1981, MeK sent supporters armed with machine guns and rocket-propelled grenade launchers into the streets to protest the new regime. But by 1983, MeK was diminished: many of its leaders had been killed, and the regime had either executed or imprisoned thousands of its members. Although MeK survived the regime's crackdown, it transferred its operational base to Iraq and its headquarters to Paris.

Hosseini does not dispute that MeK once engaged in terrorism. Rather, he alleges that MeK underwent significant changes after the 1979 revolution and was no longer a terrorist organization when he copied and distributed flyers on its behalf. As USCIS's decision explains, MeK has undergone several iterations since its founding. And as Hosseini notes, the record reveals examples of MeK's terrorist activity only up to—but not after—September 1981. Thus, Hosseini argues that the record does not support USCIS's conclusion that he supported MeK when that organization engaged in terrorist activity.

Although we do not know precisely when Hosseini's affiliation with MeK began or ended, the record supports USCIS's conclusion that Hosseini copied and distributed MeK-produced literature while MeK engaged in terrorist activity. Indeed, Hosseini stated in his March 2009 affidavit that "in the months immediately after the fall of the Shah," which occurred in 1979, political activists distributed literature about the new regime. And by Hosseini's own admission, he "began reading and distributing literature from various sources, two of which were from MeK and the Fadaian." Further, Hosseini's wife stated in her affidavit that Hosseini and his brothers "were politically active in the Mojahedin organization whose aim after the 1979 revolution was to overthrow the Islamic regime." Hosseini did not end his relationship with MeK until after he married Abdolrahmani and had his first child, which would have been—at the very earliest—December 1984. Although USCIS cannot pinpoint the date when Hosseini's affiliation with MeK began, it reasonably concluded that Hosseini began to copy and distribute the organization's literature sometime between 1979 and 1981.

*FeK.* Hosseini contests USCIS's determination that FeK is a terrorist organization, noting that the record fails to identify any terrorist activity that FeK's leaders authorized. But as

USCIS said in its decision, FeK was "an anti-Shah Marxist guerilla organization whose goal changed to overthrowing the Ayatollah after the Iranian revolution." And USCIS compared FeK to MeK, explaining that while FeK was smaller than MeK, it engaged in similar guerilla activities.

Separately, Hosseini argues that FeK splintered into different subgroups and that he was affiliated with a non-violent FeK subgroup. This argument is also unavailing. Hosseini insists that he supported the Organization of Iranian People's Fedaian (Majority) ("OIPFM"), a non-violent offshoot of the FeK. But as USCIS explains, OIPFM began in 1981 after its parent organization, Organization of Iranian People's Fedaian Guerrillas ("OIPFG"), changed its name and disavowed its guerilla warfare tactics. Because Hosseini admitted to joining—or at the very least engaging with—FeK in 1979,[4] USCIS reasonably concluded that he would have had some affiliation with OIPFG before that organization ceased engaging in guerilla warfare.

For the reasons explained above, it was not arbitrary and capricious for USCIS to determine that Hosseini engaged with two Tier III terrorist organizations, MeK and FeK.

**B.**

Hosseini also alleges that he presented clear and convincing evidence to USCIS that he had no knowledge that MeK and FeK were engaged in terrorist activity and is therefore admissible. If USCIS determines that the alien gave support to a Tier I or Tier II terrorist organization, that alien is inadmissible, regardless of whether he knew that he was supporting a terrorist organization. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc). But a different standard applies to Tier III terrorist organizations. An alien is admissible, even if he provided material support to a Tier III terrorist organization, if he can demonstrate by clear and convincing evidence that he "did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Accordingly, Hosseini must show that he presented clear and convincing evidence to USCIS that he did not know MeK and FeK were

---

[4]Hosseini stated on his application to adjust his legal status that he "joint [*sic:* joined]" FeK from 1979 to 1982. In his March 2009 affidavit, however, Hosseini denied being a FeK member but admitted to supporting FeK policies and attending its meetings.

engaged in terrorist activity *and* that USCIS issued a decision so contrary to the evidence that it was arbitrary and capricious.

Hosseini's burden is high, and he does not prevail here. USCIS's decision describes a "public and shocking" terrorist attack in 1981, during which MeK detonated bombs in the Islamic Republic party's head office that killed "some seventy high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Premier Mohammad-Javad Bahonar." Given Hosseini's acknowledgment that he "eagerly sought out information about various political viewpoints" and "began reading and distributing literature from various sources" after the 1979 revolution, it seems implausible that he was unaware of this attack and the organization that perpetrated it. In fact, Hosseini admitted that he "heard rumors" that MeK and other groups "engaged in terrorist attacks on the Islamic government's leaders and supporters."

In *Daneshvar v. Ashcroft*, this court discussed some of the factors that an agency might consider in determining whether an alien knew about an organization's terrorist activity. *See* 355 F.3d at 628. Those factors are: (1) the alien's age when he supported the organization; (2) whether the alien voluntarily disassociated from the organization; (3) the alien's testimony about his involvement with the organization; and (4) evidence that the alien engaged in violent acts of terrorism. *Id.* Hosseini argues that if USCIS applied the *Daneshvar* factors to his case, it would have determined that he lacked knowledge about MeK and FeK's terrorist activities. But *Daneshvar* is not as helpful as Hosseini suggests.

The first *Daneshvar* factor, age, weighs against Hosseini. The alien in *Daneshvar* was a minor during his involvement with the terrorist organization, prompting this court to state that "[w]e would be hard-pressed to classify any minor who sold newspapers for an organization that supported an armed revolt against a tyrannical monarch as a terrorist." *Id.* at 628. But Hosseini was at least nineteen years old when he began to spread MeK and FeK literature, and he continued to do so for approximately six years. The second *Daneshvar* factor—whether the alien voluntarily disassociated from the terrorist organization—weighs in Hosseini's favor. To be sure, Hosseini's wife threatened to leave him unless he severed his ties to MeK. But setting aside his wife's pressure, Hosseini left MeK on his own terms, like the alien in *Daneshvar*. The

third *Daneshvar* favor, which considers the alien's testimony about his involvement with the terrorist organization, is inconclusive. Hosseini supplied contradictory testimony about his knowledge of MeK and FeK's activities. In his March 2009 affidavit, Hosseini stated, "I emphatically deny that I ever learned of or knew of any reliable information that would indicate the MEK killed civilians." He also explained that he "was not aware of any case of MEK's alleged involvement in the killing of American service men in Iran prior to the revolution." Nonetheless, Hosseini stated that he "heard rumors . . . from time to time in Iran" that MeK "ha[d] engaged in terrorist attacks on the Islamic government's leaders and supporters." Finally, the fourth *Daneshvar* factor is favorable to Hosseini: there is no record evidence that Hosseini engaged in any violent acts of terrorism.

After applying those four factors, the *Daneshvar* court determined that "there is substantial evidence that Petitioner is not statutorily ineligible for immigration relief." 355 F.3d at 628. But that outcome is not compelled here. While two factors weigh in Hosseini's favor— he left MeK voluntarily and he did not engage in violent terrorism—the other factors lend a different conclusion. Hosseini was not a minor during his six-year involvement with MeK and FeK. And he admitted to hearing rumors that MeK was engaged in terrorist activity. In short, *Daneshvar* does not help Hosseini rebut USCIS's determination that he knew about MeK and FeK's terrorist activity. Furthermore, in light of his high burden, Hosseini has failed to show that USCIS's decision was arbitrary and capricious.

**C.**

Hosseini's strongest argument is that his copying and distribution of MeK and FeK literature did not amount to material support for those organizations. An alien is inadmissible if he:

> Affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training . . . [to a terrorist organization].

8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Here, USCIS concluded that Hosseini provided material support "to a terrorist organization described in clause (vi)(III)" by copying and distributing

flyers on behalf of MeK and FeK.  8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd).  Because the statute refers to *material* support, it suggests that some support may not rise to the level that would disqualify an alien from admission to the United States.  Hosseini insists that the distribution of flyers (as well as his use of a copy and fax machine on behalf of MeK) is not *material* support.  The government, by contrast, argues that even low-level, non-violent support can be material because it frees up resources for the terrorist organization to redirect toward violent activity.

To determine whether Hosseini's activities constitute material support, "[w]e begin, as always, with the text of the statute." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007).  Although the statute sets forth examples of what constitutes material support, it does not specifically define material support.  Because we lack a definition of material support, we must "give the term its ordinary meaning" and turn to dictionaries to start.  *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013).  Black's Law Dictionary provides three definitions of material, two of which could apply to this statute.  One definition compares material to "relevant," explaining that material means "having some logical connection with the consequential facts." *Black's Law Dictionary* (10th ed. 2014).  But material may also mean "significant" or "essential." *Id.*  Non-legal dictionaries offer a similar definition. *See, e.g.*, *Oxford English Dictionary* (3d ed. 2001) (defining material as "of serious or substantial import; significant, important, or of consequence); *Webster's Third New International Dictionary* (2002) (defining material as "being of real importance or great consequence").

We read material here to incorporate both the "relevant" and "significant" definitions.  Context helps us reach that conclusion.  The statute at issue bars admission to an alien who has provided material support: "for the commission of a terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(aa); "to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(bb); or "to a terrorist organization" 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc)-(dd).  That is, the support must be relevant to terrorism.  And the support must also be significant.  Indeed, the statute provides a non-exhaustive list of examples of material support, including "safe house, transportation, communication, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives,

or training" 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Those examples suggest that the support must be "significant" or even "essential" to the commission of terrorism.

Although the statute's list of examples is non-exhaustive, the copying and distribution of literature may not seem as "relevant" or "significant" to the commission of terrorism as the provision of weapons or explosives. But the Supreme Court explained in *Holder v. Humanitarian Law Project* that "seemingly benign support" may provide essential assistance to a violent terrorist organization. 561 U.S. 1, 36 (2010). In that case, the Court considered "material support" as it appears in 18 U.S.C. § 2339B, a statute criminalizing the support of foreign terrorist organizations. The Court explained that "material support" is:

> [A] valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks.

*Id.* at 30. The Court also recognized that "some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." *Id.* at 30–31. Importantly, the Supreme Court's interpretation of "material support" adopts both the "relevant" and "significant" definitions of "material." Material support is relevant to the commission of terrorism to the extent that it "frees up other resources within the organization that may be put to violent ends." *Id.* at 30. And material support is important or significant because it "helps lend legitimacy" to the terrorist organization. *Id.*

Moreover, we note that the civil statute at issue in this case captures a broader range of activity than 18 U.S.C. § 2339B. That provision creates a carveout for independent political advocacy, even if that advocacy promotes the terrorist organization's legitimacy: "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. § 2339B(h). Because there is no record evidence that Hosseini took orders from MeK or FeK—and because Hosseini insists that he was not a member of either organization—his conduct might well have fallen within this carveout, had he been charged

under § 2339B. But unlike § 2339B, 8 U.S.C. § 1182 contains no such exception for independent political advocacy.

Hosseini argues that no other circuit has considered whether non-violent advocacy—by itself—rises to the level of material support. In *Bojnoordi v. Holder*, the Ninth Circuit affirmed a BIA finding of material support because the alien passed out flyers and wrote articles—but also trained the terrorist organization's members on the use of guns. 757 F.3d 1075, 1078 (9th Cir. 2014). The Seventh Circuit affirmed a BIA finding that an alien provided material support when he distributed flyers, posted signs, looked after the local office, and recruited individuals to attend the terrorist organization's meetings for several years. *Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014). And the Fourth Circuit upheld a BIA finding that an alien who hung posters and paid monthly dues to a terrorist organization for four years had provided material support to the organization. *Viegas v. Holder*, 699 F.3d 798, 803 (4th Cir. 2012).

Nonetheless, other circuits have upheld USCIS and BIA determinations that an alien provided material support to a terrorist organization, even when that support was "relatively low-level." *Seasay v. Attorney Gen. of U.S.*, 787 F.3d 215, 221 (3d Cir. 2015). The Third Circuit, for example, upheld a material support determination involving an asylum applicant who provided food and set up tents for a terrorist organization. *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 296-301 (3d Cir. 2004). The Fourth Circuit upheld the BIA's determination that an alien who provided occasional use of his kitchen and overnight accommodations to members of a terrorist organization gave material support. *Barahona v. Holder*, 691 F.3d 349, 351, 356 (4th Cir. 2012). And the BIA affirmed an immigration judge's denial of an alien's asylum request because the alien, who was kidnapped by guerillas in El Salvador, "was coerced into undergoing weapons training and performing forced labor in the form of cooking, cleaning, and washing [her captors'] clothes." *Matter of A-C-M-*, 27 I. & N. Dec. 303, 304 (BIA 2018). In that published decision, the BIA held that the alien had provided material support to her captors and, importantly, that "'material support' has no quantitative component." *Id.* at 308.

Our role, in part, is to set aside agency action "when it is in conflict with the language of the statute relied upon by the agency." *City of Cleveland*, 508 F.3d at 838. No such conflict exists here. We interpret material—*i.e.*, relevant and significant—support to include Hosseini's

copying and distribution of flyers on behalf of MeK and FeK. That support was relevant, inasmuch as it introduced Iranians to MeK and FeK and allowed those organizations to redirect some of their communications resources elsewhere. And the support was significant: the non-violent flyers, which informed Iranians about the regime's human rights abuses, gave legitimacy to MeK and FeK—even though those same organizations were engaged in terrorism. The record contains no evidence that Hosseini supported MeK and FeK's violent activities or engaged in violence on behalf of those organizations. Indeed, by his own account, Hosseini insists that he disseminated MeK and FeK flyers "to help educate the people about the failings of the Iranian Islamic government." But this makes Hosseini's support no less material. Thus, we conclude that USCIS's determination that Hosseini provided material support to MeK and FeK was not arbitrary and capricious.

**D.**

Finally, we address Hosseini's argument that USCIS acted in an arbitrary and capricious manner for issuing two conflicting decisions on the same issue: his admissibility to the United States. Because he obtained asylum in the United States in 1999, Hosseini argues that USCIS necessarily determined that he was admissible to the United States. As Hosseini correctly notes, USCIS cannot grant asylum "until the identity of the applicant has been checked against all appropriate records or databases . . . to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum." 8 U.S.C. § 1158(d)(5)(A)(i). And an asylum applicant is inadmissible if he provided material support to a terrorist organization. 8 U.S.C. § 1158(b)(2)(A)(v). Although USCIS granted Hosseini asylum in 1999—and thus determined that he was admissible—it denied Hosseini's application to adjust his legal status fifteen years later after concluding that Hosseini gave material support to MeK and FeK and that he was therefore inadmissible. Hosseini contends that USCIS's conflicting decisions demonstrate that the agency did not act reasonably, as required under the Administrative Procedure Act. *See, e.g.*, *Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.").

Hosseini's argument is unavailing for the two reasons that USCIS set forth in its decision. First, USCIS did not rely on the same set of facts when it made its decisions. When USCIS granted Hosseini derivative asylum in 1999, it had no access to his wife's file and therefore did not know about Hosseini's involvement with MeK. But in 2014, when USCIS determined that Hosseini was inadmissible, it had reviewed both his wife's file, in which she described Hosseini's involvement with MeK, and his application, in which he admitted to joining FeK. Second, the laws governing the admissibility of asylum applicants changed in 2001, when the PATRIOT Act added new terrorism-related grounds for inadmissibility, including 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Thus, when USCIS denied Hosseini's application in 2014, it relied on law that had changed since it granted Hosseini's asylum request in 1999.

Because USCIS has provided a well-reasoned explanation for its decisions, we conclude that it did not act in an arbitrary or capricious manner when it ultimately rejected Hosseini's application because of his inadmissibility.

## V.

For the foregoing reasons, we AFFIRM the district court's decision.