NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0659n.06

No. 13-3896

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 25, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| DIVYESH PATEL, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BOGGS, BATCHELDER, and WHITE, Circuit Judges.

PER CURIAM. Divyesh Patel pled guilty to six counts related to Medicaid fraud pursuant to a plea agreement that included an appellate waiver provision. He appeals the district court's imposition of restitution in the amount of $1,939,864, arguing that it exceeds the loss amount agreed to in his plea agreement and is unsupported by the record. Because the amount does not violate the plea agreement and Patel otherwise waived his right to appeal the restitution amount, we AFFIRM.

## I. Facts

Patel was the owner and president of Alpine, an Ohio corporation, which Patel incorporated in 2003. Alpine provided home health services, including nursing, homemaker, and personal-care services to elderly and disabled clients in their homes. In order to be reimbursed by Medicaid, Alpine was required to agree to comply with all applicable Medicaid statutes, regulations, and guidelines.

In June 2006, Patel hired Belita Mabel Bush, also known as Bea Bush ("Bush"), and employed her as the office manager and Director of Provider Services at Alpine, although he knew that Bush had been convicted of a federal health-care fraud violation and was "excluded" from health-care benefit programs, including from participating in billing. [1] Soon after, Patel had Bush prepare Form 1500, which was used to submit Alpine's billing to Medicaid and Medicare. From January to May of 2006, Medicaid paid Alpine approximately $177,716. From June 2006 through October 2009, after Patel hired Bush and put her in charge of billing, Medicaid paid Alpine approximately $2,564,392. [2]

The grand jury returned a six-count indictment against Patel. He pled guilty, pursuant to a written plea agreement, agreeing that, in addition to violating the health-care statutes by hiring Bush and putting her in charge of Alpine's billing, Patel and Bush concealed from the Ohio Medicaid Program and Medicare that Bush had been excluded from federal health-care programs; that Patel had reason to know that many of the records to support claims for services contained false and forged signatures of doctors, nurses, home health aides, or patients; and Patel had reason to know that Alpine submitted claims to Medicaid for home health services that were not provided or were provided by unqualified or unauthorized persons.

Although the plea agreement states "[a]s a result of the conspiracy, Medicaid and Medicare suffered an actual loss of approximately $241,690,[3]" under the "Restitution" section of the plea agreement, Patel agreed:

---

[1] "Exclusion means that items and services furnished, ordered or prescribed . . . [by an excluded individual or entity] will not be reimbursed under Medicare, Medicaid and all other Federal health care programs . . . . Office of Inspector General – Health Care, Department of Health and Human Services, Program Integrity – Medicare and State Health Care Programs, 42 CFR § 1001.2.

[2] This equates to an increase in revenue from approximately $35,543 to $62,546 a month.

[3] Investigators reviewed a sample of four patient files and determined that those four files contained $241,690 of false billings.

to make full restitution as ordered by the Court pursuant to 18 U.S.C. § 3663A, on a joint and several basis with Belita A. Bush, payable immediately on such terms and conditions as the Court may impose, for the losses caused by Defendant's relevant conduct in this case, as defined under Guideline § 1B1.3.

The plea agreement also contained an appellate waiver provision, which Patel acknowledged in a colloquy with the court.

During the change of plea hearing, Patel confirmed that he signed the plea agreement and initialed each page only after he "read and understood" it. The district court specifically addressed the issue of restitution and inquired about the amount of restitution that was anticipated. The government told the court that although the exact amount of restitution had yet to be determined, restitution would be "in excess of the agreed-upon loss amount," and "in excess of a million dollars." The district court then addressed Patel directly on the issue of restitution and his understanding that it would exceed $1 million. Specifically, the court asked:

> THE COURT: *** And as you heard Mr. Bennett speak about restitution, he, you and your attorneys are still working through that. And I know that's also mentioned again at paragraph 22.
> But you understand, although the amount is not yet certain, that the government will ask, and I am likely to require, that you repay victims of your crimes a certain amount that could be in excess of $1 million. Do you understand, sir?
>
> PATEL: Yes, Your Honor.

Later in the change of plea hearing, the district court again addressed the restitution issue and specifically confirmed with Patel that the restitution amount could exceed $1 million. Specifically, the district court stated:

> THE COURT: The balance of page 11 speaks about restitution. We've already spoken about that. And I understand that I will be provided a number at the time of sentencing. And Mr. Patel also understands that there will be a number, and it's likely to be in *excess of $1 million*. (emphasis added).

Immediately after confirming that the amount of restitution would likely exceed $1 million and addressing the "Other Provisions" portion of Patel's plea agreement, the district court inquired directly of Patel, "Do you understand it in the same way?" and Patel responded, "Yes, Your Honor."

The district court also addressed the "Waiver of Appellate Rights" section of the plea agreement in detail. The court confirmed Patel's understanding that he was waiving the right to appeal his conviction and sentence under 18 U.S.C. § 3742 and 28 U.S.C. § 2255. After explaining each appellate right specifically waived, the court inquired of Patel whether he understood the rights he was waiving, and Patel confirmed his understanding of the appellate rights he was waiving. At no time during the change of plea hearing did Patel or his counsel object to the court's statement that restitution would likely exceed $1 million, or request to reserve the right to appeal the amount of restitution ordered.

The district court also asked the government to read the factual basis and relevant conduct into the record, which included that Medicaid paid Patel and Alpine approximately $2,564,392 during the time Bush submitted the billings for Alpine. Patel requested that a factual change be made regarding who owned the motel from which Alpine originally operated and the street address to which Alpine relocated after it moved from the motel. Patel did not request any corrections be made to his criminal conduct, or the amount of money Medicaid paid to Alpine during the time Bush handled the medical billings. Instead, after the district court confirmed that Patel heard and understood the factual basis and relevant conduct, the court asked Patel if it "accurately represent[ed] your actions leading to the charges against you . . . ?" to which Patel answered, "Yes, Your Honor."

The Presentence Report's "Offense Conduct" paragraph states Medicaid and Medicare payments totaled $2,564,392, and "[a]s a result of the conspiracy, Medicaid and Medicare suffered a loss of approximately $241,690." In the next paragraph, "Victim Impact," the Presentence Report states: "The USAO has indicated that the amount of restitution in this case is $1,939,864, which is the amount of profit that the defendant made in this scheme." Patel objected to the Presentence Report's restitution amount of $1,939,864, arguing that the loss was found to be $241,690, that much of the money received was put toward legitimate payroll expenses, and that the government wrongly sought to recover the entire amount paid rather than the actual loss to the government.

On July 18, 2013, the district court conducted a sentencing hearing and heard argument regarding restitution. The parties addressed the fact that the $1,939,864 restitution amount requested by the government was greater than the agreed-upon loss of $241,690[4] stated in the written plea agreement. The government explained that in calculating the $1,939,864 figure, in an effort "to be fair" to Mr. Patel, the government assumed the first 60 days of billings for each patient's care were legitimate because during the first 60 days of care there is often coordination of care with other physicians and nurses. It then ascertained the total amount of the first 60 days of payments for all patients, ($624,708), subtracted $624,708 from the total payments to Alpine of $2,564,392, and arrived at the total amount of restitution, $1,939,864.

---

[4] As a result of the review of the four files used to determine the $241,690 figure, the government extrapolated that the remaining billings were fraudulent. All billings submitted by Bush were "excluded." The government states that in "negotiating pleas . . . with Mr. Vitullo on behalf of Mr. Patel, the suggestion was that the loss amount [$241,690] would make sense to use that here . . . but the understanding was that the restitution amount would be greater than the loss amount." PID 217. The government asserts that "actual loss" is a legal term under the Mandatory Victims Restitution Act and is not the $241,690 figure used in the plea agreement, but the amount that was paid out by Medicaid and Medicare to Alpine, $2,564,392. The government asserts it used the $241,690 figure for plea agreement offense level adjustment purposes and refers to the loss amount in the plea agreement as "the loss for terms of the plea agreement." PID 222.

The district court agreed with the government and concluded, based upon the government's sentencing memorandum and the oral arguments of the parties, that the appropriate amount of restitution is $1,939,864. The district court further determined that the government's calculation of the restitution amount was not arbitrary, and that the government met its burden of establishing the amount of restitution by a preponderance of the evidence. Patel timely appealed.

## II. Discussion

The government argues Patel waived his right to appeal the restitution amount. Patel does not address the waiver issue in his brief.

A defendant in a criminal case may waive any right, even a constitutional right, by means of a plea agreement. *United States v. McGilvery*, 403 F.3d 361, 362 (6th Cir. 2005). He may waive his right to appeal as part of a plea agreement if the waiver is made knowingly and voluntarily. *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004). In determining whether a waiver was knowingly and voluntary, this court reviews the plea colloquy and the written agreement. *See Swanberg*, 370 F.3d at 626 (appeal waiver upheld where the record clearly demonstrated that the waiver was part of the plea agreement, appellant had an opportunity to read and review the plea agreement with counsel, appellant was informed in open court that he had waived the right to appeal his sentence, and district court found that appellant made a knowing waiver of those rights); *McGilvery*, 403 F.3d at 362–63 (same); *United States v. Fleming*, 239 F.3d 761, 764 (6th Cir. 2001) (appeal waiver upheld where the record clearly demonstrated that appellant understood the waiver contained in the plea agreement and consented to it voluntarily).

Patel does not dispute that he knowingly and voluntarily entered into a plea agreement with the Government. In his colloquy with the court, Patel acknowledged that he had been

advised by counsel of his rights to appeal his conviction or sentence, including through post-conviction collateral attack and that he expressly and voluntarily waived those rights, except as in the plea agreement. Patel reserved the right to appeal:

> (a) any punishment in excess of the statutory maximum; (b) any sentence to the extent it exceeds the greater of the maximum of the sentencing imprisonment range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court; or (c) the Court's determination of Defendant's Criminal History Category.

In addition, Patel's plea agreement stated that nothing in the plea agreement would bar him from filing an appeal based upon a claim of ineffective assistance of counsel or prosecutorial misconduct. However, Patel did not reserve his right to appeal the amount of restitution ordered. And, during the change of plea hearing, the district court confirmed that Patel had signed the plea agreement and initialed every page indicating that Patel had "read and understood" each page. Additionally, Patel acknowledged that he: (1) had read the plea agreement; (2) had an opportunity to discuss it with his attorney; (3) fully understood the plea agreement; (4) was satisfied with the legal services and advice provided to him by his attorney; and (5) had entered into the agreement knowingly, freely and voluntarily and without threats from anyone, after due consultation with his attorney. We therefore conclude that unless the restitution amount violates the plea agreement, appeal of the amount is waived.

The agreement clearly contemplated a restitution amount in excess of the agreed upon loss figure. Any ambiguity presented by the use of the $241,690 figure in the statement of loss was clarified in the colloquy during which the court repeatedly asked Patel to confirm he was aware that restitution could exceed one million dollars.

Because Patel has not replied to the government's argument that he waived his right to appeal the amount of restitution, and it does not appear that he did reserve that right, we need not further address the amount of restitution.

We AFFIRM.

HELENE N. WHITE, Circuit Judge, dissenting. Patel agreed to "make full restitution as ordered by the Court pursuant to 18 U.S.C § 3663A." He reserved the right to appeal "any punishment in excess of the statutory maximum." Fairly read, he waived his right to appeal discretionary determinations regarding his sentence and reserved the right to appeal rulings that exceed statutory authorization. *United States v. Margaret Ann Gordon*, 480 F.3d 1205 (10th Cir. 2007); s*ee United States v. Smith*, 344 F.3d 479 (6th Cir.2003) (an appeal waiver did not bar an appeal of the district court's restitution order when plea agreement contained few specifics on the amount or manner by which the amount would be calculated). Because case law clearly establishes that under 18 U.S.C § 3664(f)(1)(A) the government has the burden of establishing actual loss, *U.S. v. Hogland*, 178 F.3d 410,414 (6th Cir. 1999); *U.S. v. Healy*, No. 12-6008, 2014 W.L. 304684, at *6 (6th Cir. Jan.29, 2014), and the government presented no proof of actual loss, only the total amount of payments and a deduction that has no relation to actual loss, I conclude that the sentence exceeded statutory authorization and the waiver does not foreclose the instant appeal.

Although the loss calculation under U.S.S.G. § 2B1.1 can be based on intended loss, restitution must be based on actual loss, and the government has the burden of establishing the amount of that actual loss. *Healy* at *6. Here the government supported its request for $1,939,864 in restitution by reference to two figures. The first, $2,564,393, represents the amount Medicaid paid Alpine during the period Bush submitted the billings. The second, $624,708, represents the total billings submitted for the first 60 days of each patient's care. The government arrived at its restitution figure by subtracting the second number from the first. The government explained that it assumed legitimate services were provided during the first 60 days and gave Patel credit for all services performed during that period. Because no further credits

were given, the unstated assumption is that all charges after 60 days were fraudulent. The government provided no further explanation for its methodology. Although the blanket allowance of the first 60 days' payments may have been generous to Patel, there was no testimony whatsoever to support the underlying assumption that all payments beyond 60 days were fraudulent.

The record established that Alpine billed for services that were never provided and were submitted with forged signatures and that Patel and Alpine sent out aids with criminal convictions that disqualified the aids from performing the services, but there is no indication how often that happened. The government is correct that it cannot be expected to go through every file and determine the exact amount of the fraud, but it does not follow that it has no obligation to put forth a method of computing loss that has some factual basis. The government could have taken any number of approaches. It could have submitted the calculations that caused it to arrive at the $241,690 figure for the four patients whose records were examined, compared that figure to the total billings for those four patients and argued for application of the same percentage disallowance and loss here. Or it could have picked a few files, identified the actual loss for those patients and multiplied the average loss by the number of patients. It is unknown whether these approaches would have resulted in a higher, lower or similar restitution figure, but the government completely failed to offer any rational approach to approximating Medicaid's actual loss.

I would VACATE the restitution award and REMAND to district court.